ACCEPTED
05-14-01419-CR
FIFTH COURT OF APPEALS
DALLAS, TEXAS
5/13/2015 9:44:00 AM
LISA MATZ
CLERK

# No. 05-14-01419-CR

**IN THE COURT OF APPEALS
FOR THE FIFTH DISTRICT OF TEXAS
AT DALLAS**

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
5/13/2015 9:44:00 AM
LISA MATZ
Clerk

---

## TERRY RAY McMILLAN,
### Appellant

### v.

## THE STATE OF TEXAS,
### Appellee

---

*On appeal from the 265th Judicial District Court
of Dallas County, Texas
In Cause No. F05-50140-R*

---

## BRIEF FOR APPELLANT

---

*Counsel of Record*

**Lynn Richardson**
**Chief Public Defender**
**Dallas County, Texas**

**Katherine A. Drew**
**Assistant Public Defender**
**State Bar No. 06117800**

**Frank Crowley Courts Building**
**133 N. Riverfront Boulevard, LB-2**
**Dallas, Texas 75207-4399**
**(214) 875-2360 (phone)**
**(214) 875-2363 (fax)**
**Kathi.Drew@dallascounty.org**

*Attorneys for Appellant*

# LIST OF PARTIES

**APPELLANT**
Terry Ray McMillan

**APPELLEE**
The State of Texas

**DEFENSE COUNSEL AT TRIAL**
Scottie Allen
4144 N. Central Expressway, Suite 650
Dallas, Texas 75204

**STATE'S ATTORNEY AT TRIAL**
Rebecca Dodds and Rick Jackson
Dallas County District Attorney's Office
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399

**APPELLANT'S ATTORNEY ON APPEAL**
Katherine A. Drew
Dallas County Public Defender's Office
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-2
Dallas, Texas 75207-4399

**STATE'S ATTORNEY ON APPEAL**
Susan Hawk (or her designated representative)
Dallas County District Attorney's Office
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399

# TABLE OF CONTENTS

LIST OF PARTIES ..................................................................................................... ii

INDEX OF AUTHORITIES........................................................................................ .v

STATEMENT OF THE CASE................................................................................... .1

ISSUES PRESENTED................................................................................................ .1

STATEMENT OF FACTS ......................................................................................... .3

SUMMARY OF ARGUMENT .................................................................................. .24

ARGUMENT .............................................................................................................. .26

Point of Error 1, Restated........................................................................................ .26

> *The State failed in its burden of persuasion to refute Appellant's proof of self-defense; hence, the evidence is legally insufficient to support the jury's murder verdict.*

Point of Error 2, Restated........................................................................................ .36

> *The evidence will support a conviction for manslaughter.*

Point of Error 3, Restated........................................................................................ .40

> *Appellant is entitled to a new trial because a critical exhibit was destroyed through no fault of his own.*

Point of Error 4, Restated........................................................................................ .56

> *The trial court abused its discretion by denying Appellant's motion for mistrial following questioning of Appellant by the State regarding an extraneous offense. (RR5: 78-80).*

Point of Error 5, Restated........................................................................................ .56

> *The trial court abused its discretion by denying Appellant's motion for mistrial following repeated questioning of Appellant by the State regarding an extraneous offense. (RR5: 78-80).*

Point of Error 6, Restated........................................................................................ .62

> *The trial court erred by not holding a hearing on Appellant's motion for new trial. ...............................................................................................*

Point of Error 7, Restated.......................................................................................64

*The trial court erred by overruling defense counsel's objection to improper jury argument at the punishment phase of the trial. (RR6: 56).*

Point of Error 8, Restated.......................................................................................64

*The trial court erred by overruling defense counsel's motion for mistrial following improper jury argument at the punishment phase of the trial. (RR6: 56-57).*

Point of Error 9, Restated.......................................................................................64

*The trial court erred by overruling defense counsel's objection to improper jury argument at the punishment phase of the trial. (RR6: 57-58).*

Point of Error 10, Restated.......................................................................................68

*The judgment should be modified to reflect the correct names of the trial prosecutors.*

PRAYER ................................................................................................................69

CERTIFICATE OF SERVICE ...............................................................................70

CERTIFICATE OF COMPLIANCE......................................................................70

# INDEX OF AUTHORITIES

**Cases**

*Archie v. State*,
221 S.W.3d 695 (Tex. Crim. App. 2007) ..............................................................60

*Archie v. State*,
340 S.W.3d 734 (Tex. Crim. App. 2011) ..............................................................59

*Asberry v. State*,
813 S.W.2d 526 (Tex. App.—Dallas 1991, pet. ref'd) ........................................69

*Banks v. State*,
312 S.W.3d 42 (Tex. App. – Dallas 2008, pet. ref'd) ..........................................44

*Bigley v. State*,
865 S.W.2d 26 (Tex. Crim. App. 1993) ..............................................................68

*Borjan v. State*,
787 S.W.2d 53 (Tex. Crim. App. 1990) ..............................................................67

*Bowen v. State*,
374 S.W.3d 427 (Tex. Crim. App. 2012) ..............................................................39

*Brooks v. State*,
323 S.W.3d 893 (Tex. Crim. App. 2010) ..............................................................37

*Brown v. State*,
270 S.W.3d 564 (Tex. Crim. App. 2009) ..............................................................66

*Clark v. State*,
365 S.W.3d 333 (Tex. Crim. App. 2012) ..............................................................58

*Collier v. State*,
999 S.W.2d 779 (Tex. Crim. App. 1999) ..............................................................39

*Cook v. State*,
884 S.W.2d 485 (Tex. Crim. App. 1994) ..............................................................38

*Cortez v. State*,
683 S.W.2d 419 (Tex. Crim. App. 1984) ...................................................... 67, 68

*Culley v. State*,
505 S.W.2d 567 (Tex. Crim. App. 1974) ..............................................................67

*Ex parte McMillan*,
   No. WR-80,864-02, 2014 Tex. Crim. App. Unpub. LEXIS 961 (Tex. Crim. App. September 17, 2014)........................................................................................1, 62

*Gardner v. State*,
   730 S.W.2d 675 (Tex. Crim. App. 1987)........................................................60

*Gilbert v. State*,
   196 S.W.3d 163 (Tex. App. – Houston [1st Dist.] 2005, pet. ref'd)...................38

*Guzman v. State*,
   188 S.W.3d 185 (Tex. Crim. App. 2006)........................................................38

*Hawkins v. State*,
   135 S.W.3d 72 (Tex. Crim. App. 2004)..........................................................60

*Issac v. State*,
   989 S.W.2d 754 (Tex. Crim. App. 1999).........................................................41

*Jackson v. Virginia*,
   443 U.S. 307 (1979) ......................................................................................37

*Jones v. State*,
   544 S.W.2d 139 (Tex. Crim. App. 1976).........................................................28

*Jones v. State*,
   944 S.W.2d 642 (Tex. Crim. App. 1996).........................................................39

*Ladd v. State*,
   3 S.W.3d 547 (Tex. Crim. App. 1999) ...................................................... 59, 60

*Lucero v. State*,
   246 S.W.3d 86 (Tex. Crim. App. 2008)..........................................................63

*Martin v. State*,
   13 S.W.3d 133 (Tex. App.—Dallas 2000, no pet.)............................................42

*Mestas v. State*,
   214 S.W.3d 1 (Tex. Crim. App. 2007).............................................................63

*Nava v. State*,
   415 S.W.3d 289 (Tex. Crim. App. 2013).........................................................42

*Osuch v. State*,
   976 S.W.2d 810 (Tex. App.—Houston [1st Dist.] 1998, no pet.) .......................42

*Ovalle v. State*,
   13 S.W.3d 774 (Tex. Crim. App. 2000).........................................................59

*Porter v. State*,
154 Tex. Crim. 252, 226 S.W.2d 435 (1950) .......................................................68

*Resendez v. State*,
306 S.W.3d 308 (Tex. Crim. App. 2009) ............................................................58

*Routier v. State*,
112 S.W.3d 554 (Tex. Crim. App. 2003) ............................................................42

*Saxton v. State*,
804 S.W.2d 910 (Tex. Crim. App. 1991) ............................................................27

*Schroeder v. State*,
123 S.W.3d 398 (Tex. Crim. App. 2003) ............................................................38

*Semaire v. State*,
612 S.W.2d 528 (Tex. Crim. App. 1980) ............................................................27

*Stadt v. State*,
182 S.W.3d 360 (Tex. Crim. App. 2005) ............................................................38

*Torres v. State*,
92 S.W.3d 911 (Tex. App. – Houston [14th Dist.] 2002, pet. ref'd) ............ 66, 67

*White v. State*,
No. 05-08-00241-CR, 2011 Tex. App. LEXIS 9332 (Tex. App.—Dallas
November 22, 2011, pet. ref'd) (not designated for publication) ........................37

*Whitney v. State*,
396 S.W.3d 696 (Tex. App.—Fort Worth 2013, pet. ref'd) ...............................59

*Williams v. State*,
235 S.W.3d 742 (Tex. Crim. App. 2007) ............................................................38

*Winfrey v. State*,
323 S.W.3d 875 (Tex. Crim. App. 2010) ............................................................37

*Wood v. State*,
18 S.W.3d 642 (Tex. Crim. App. 2000) ........................................................ 59, 60

*Zuliani v. State*,
97 S.W.3d 589 (Tex. Crim. App. 2003) ..............................................................27

**Statutes**

TEX. CODE CRIM. PROC. art. 11.07 § 3(b) .................................................................43

TEX. CODE CRIM. PROC. art. 40.001 .........................................................................63

TEX. PENAL CODE § 12.33...........................................................................................40

TEX. PENAL CODE § 19.02 ...............................................................1

TEX. PENAL CODE § 19.04 .............................................................40

TEX. PENAL CODE § 19.04(a) .........................................................37

TEX. PENAL CODE § 6.02(d) ...........................................................38

TEX. PENAL CODE § 6.03(a) ...........................................................38

TEX. PENAL CODE § 6.03(c) ...........................................................38

TEX. PENAL CODE § 9.31(a) ...........................................................26

TEX. PENAL CODE § 9.32 ...............................................................27

**Rules**

TEX. R. APP. P. 13.1(c) ...................................................................44

TEX. R. APP. P. 13.6 .......................................................................44

TEX. R. APP. P. 34.6(c)(5) ..............................................................42

Tex. R. App. P. 34.6(f) ........................................................... 41, 56

TEX. R. APP. P. 43.2(b) ..................................................................68

TEX. R. EVID. 404(b) .....................................................................60

**TO THE HONORABLE COURT OF APPEALS:**

COMES NOW Appellant, Terry Ray McMillan, and submits this brief on appeal from a conviction for murder in the 265th Judicial District Court of Dallas County, Texas, the Honorable Keith Dean,[1] judge presiding.

## STATEMENT OF THE CASE

Appellant was charged with murder in violation of TEX. PENAL CODE §19.02. (CR1: 7). Appellant entered a plea of not guilty and was tried before a jury, which subsequently found Appellant guilty and assessed punishment at forty years' imprisonment. (CR1: 43; RR3: 6,7; RR6: 5,59).

Judgment was entered on May 25, 2006. (CR1: 43). Notice of appeal was not timely filed. Appellant sought and was afforded an out-of-time appeal on a writ of habeas corpus. *Ex parte McMillan*, No. WR-80,864-02, 2014 Tex. Crim. App. Unpub. LEXIS 961 (Tex. Crim. App. September 17, 2014); (*see also* CR1: 120-121). Notice of appeal was thereafter timely filed. (CR1: 129-130; 137-138).

## ISSUES PRESENTED

### Point of Error 1

*The State failed in its burden of persuasion to refute Appellant's proof of self-defense; hence, the evidence is legally insufficient to support the jury's murder verdict.*

---

[1] The current judge of the 265th Judicial District Court is the Honorable Jennifer Bennett.

1

**Point of Error 2**

*The evidence will support a conviction for manslaughter.*

**Point of Error 3**

*Appellant is entitled to a new trial because a critical exhibit was destroyed through no fault of his own.*

**Point of Error 4**

*The trial court abused its discretion by denying Appellant's motion for mistrial following questioning of Appellant by the State regarding an extraneous offense. (RR5: 78-80).*

**Point of Error 5**

*The trial court abused its discretion by denying Appellant's motion for mistrial following repeated questioning of Appellant by the State regarding an extraneous offense. (RR5: 78-80).*

**Point of Error 6**

*The trial court erred by not holding a hearing on Appellant's motion for new trial.*

**Point of Error 7**

*The trial court erred by overruling defense counsel's objection to improper jury argument at the punishment phase of the trial. (RR6: 56).*

**Point of Error 8**

*The trial court erred by overruling defense counsel's motion for mistrial following improper jury argument at the punishment phase of the trial. (RR6: 56-57).*

## Point of Error 9

***The trial court erred by overruling defense counsel's objection to improper jury argument at the punishment phase of the trial. (RR6: 57-58).***

## Point of Error 10

***The judgment should be modified to reflect the correct names of the trial prosecutors. (CR1: 43).***

## STATEMENT OF FACTS

In the early morning hours of March 2, 2005, Charles Calhoun was shot outside his apartment in Dallas, Texas, and died shortly thereafter of a single gunshot wound to the abdomen. (RR4: 208).

Witnesses saw Appellant standing close to Charles with a gun in his hand, but only one witness claimed to have actually seen Appellant shoot Charles. (RR3: 112-113,136,180,203,221,233,269,289; RR4: 100,101,104,136,137). Appellant admitted that he fired a gun twice in Charles' direction; he did so, however, only in self-defense and was not trying to kill Charles. (RR5: 70-73). The jury rejected Appellant's self-defense testimony, as well as the lesser included offense instruction on manslaughter, and convicted him of murder. (CR1: 74).

### *The State's Witnesses*

On March 2, 2005, the Calhoun brothers, Charles and John,[2] had been living for about a month with their cousin, Robert Jones, in Apartment 101 at 3826 Pine Street. (RR3: 90-92,205-207). A prostitute, Catherine, had also been staying at the apartment for a few days.[3] (RR3: 94,209,210,293-294).

About 10:00 p.m. that evening, they were joined by others: Robert's sister Ida Jones, Tony Hoyle, and Alexia (a/k/a Alexis) Davis. (RR3: 92,208; RR4: 5-8; 88-90; RR5: 124). The group played dominoes, drank alcohol, and may have passed around a blunt.[4] (RR3: 92,102,251; RR4: 91-92,118). About 11:30 p.m.,

---

[2] Many of the participants in this trial were referred to by "street names," which are as follows:

>  Appellant = "Black Mike" or "Money Mike;"
>  Charles = "C-Note;"
>  Robert = "Brown Eyes," or "Naka;"
>  John = "Bluejay" or "J-Ralph;"
>  Catherine  = "Cat;"
>  Ida = "Chika;"
>  Tony = "T-Ray."

(RR3: 93,97-99,104,113,130,159,179,186,197,210-211,295-297,306,308-312;RR4:12-13,90-93). For consistency, Appellant will refer to all lay witnesses by their first names. Police officers and other professionals will be referenced by their last names.

[3] Catherine testified that Robert, Charles and John had all picked her up at the same time. (RR3: 308, 309).

[4] A "blunt" was described as a cigar which has been hollowed out, the tobacco removed and replaced with marijuana. (RR3: 102,153). Alexia did not see anyone smoking a blunt. (RR4: 118).

4

everyone except Catherine and Tony[5] went to a strip joint or club called "Under the Bridge" off Lamar Street in Charles' car.[6] (RR3: 94,96,155,209-210,249; RR4: 7,8,92).

At the club, Robert met up with Precious, a dancer he was dating.[7] (RR3: 209-210,249). Robert heard Charles talking with Appellant about buying a car and he joined in this conversation. (RR3: 211-213,250). No one saw Charles engage in any arguments or confrontations at the club. (RR3: 95; RR4: 9,10,93-94).

The group stayed at the club drinking and dancing until 2:00 a.m. when they left to return to the apartment in Charles' car.[8] (RR3: 94,155,209,213; RR4: 10,94). On the way out of the parking lot, Charles and Appellant had a conversation about going to an after-hours[9] club which resulted in Appellant following the group to the apartment in his car. (RR3: 96-98,100,158-160,214-216,253; RR4: 11-14,36,37,94-

---

[5] Tony and Catherine remained at the apartment. (RR4: 15,92,93,117; RR5: 127-129).

[6] Charles' car was described as a green Cadillac Northstar. (RR3: 96,152).

[7] Robert testified that Catherine and Precious knew about each other. (RR3: 258). However, Catherine testified that she did not know about Precious. (RR3: 309). Precious did not testify.

[8] The dancer, Precious, was part of this group. (RR3: 209,213; RR4: 10).

[9] John testified that it was only Charles and Appellant who were planning on going to the after-hours club. (RR3: 97-98,160). Robert testified that everyone was planning on going; they were going to get Alexia's car. (RR3: 214,253-254). Ida testified that several members of the group were planning on going. (RR4: 43,46).

96,118-119). Once at the apartment, they were joined by two other men, "Silk"[10] and "Ceelo,"[11] who were Appellant's friends. (RR3: 103,170,216-217,298; RR4: 15,16,45,97,128).

At the point when the group returns to the apartment, the testimony of the State's witnesses becomes conflicting and inconsistent regarding the events leading up to the shooting, the shooting, and the immediate aftermath of the shooting:

### John Calhoun

John testified that the group talked, joked and just hung out for about 40-45 minutes while waiting for Appellant's friends to arrive. (RR3: 102,167-168,181). An argument started when Appellant inquired about Catherine and learned she was a prostitute:

> My brother…say, "Oh, she is a prostitute." And he…say, "What your cousin doing with her? He ain't making no money with her or nothing? If she ain't out there, she ain't making no money."
>
> ***
>
> And we were like, "No, man. My little cousin, he don't do nothing like that." So he was like, "Well, she need… some pimping."

---

[10] Silk's name was Charles Brown; he did not testify at trial. (RR5: 84). At the time of trial, Appellant had not heard from Silk and thought he might be in California. (RR5: 74). Catherine had seen Silk before on the "track," *i.e.,* Harry Hines "where the prostitutes go to work." (RR3: 317).

[11] Ida knew "Ceelo," (RR4: 15,16), who was never identified by another name. Ceelo did not testify at trial.

(RR3: 104-105; *see also* RR3: 171-172,181). Robert replied "She ain't going nowhere. She over here with me." (RR3: 106,172). Charles backed Robert up in this discussion. (RR3: 106-107,172). This threatened to become physical and John got between Charles and Appellant. (RR3: 107-109,174,182). John told Appellant that Catherine was not going anywhere with him and that it was time for Appellant to go. (RR3: 107,108,109,174). Appellant left. (RR3: 109-110).

John did not consider this to be a serious argument. (RR3: 109,178). Nevertheless, John followed Appellant and apologized for Charles' behavior. (RR3: 108-109,134,176,199). Silk and Ceelo[12] got into a car and were urging Appellant to "come on." (RR3: 176).

John went back inside the apartment. (RR3: 110). Catherine had gone outside and was talking to Appellant. (RR3: 110,178). When Catherine came back inside, Ida told her that she needed to "go on and leave." (RR3: 111). The group followed Catherine into Robert's room where they were helping her pack when shots were heard outside the apartment. (RR3: 112,178,180,184,202). John heard Alexis say "[h]e just shot your brother." (RR3: 112,180).

John ran outside; he saw Appellant standing over Charles with a gun in his hand (RR3: 112-113,136,180,203). John asked Appellant not to shoot Charles

---

[12] John did not identify these men by name. (RR3: 176).

7

again. (RR3: 114,186). According to John, Appellant turned, said "Get back, nigger," and then started shooting at the others. (RR3: 114,186,189,191). Everyone ran back inside. (RR3: 114-115). Robert was shot. (RR3: 115,189). Appellant drove off in his car. (RR3: 115).

John testified that he never saw Charles with a gun, either at the apartment or at the club. (RR3: 117). He did not see a gun on the ground around him. (RR3: 118). Appellant and Charles were the only two people in the area. (RR3: 135). John testified that he ran to Charles, grabbed Charles by the head, and put Charles' head in his lap. (RR3: 117,136). Charles was still breathing at this time but was not responsive. (RR3: 136,137). Charles died later at the hospital. (RR3: 137).

John did not witness the actual shooting. (RR3: 182). He did not see Charles go outside and did not know why Charles went outside. (RR3: 196,202). John did not know of any argument occurring outside the apartment. (RR3: 183).

While John spoke to five or six different police officers, he never gave a written statement. (RR3: 128-129). He identified Appellant's photograph from a photographic line-up.[13] (RR3: 129-130; State's Exhibit 25).

---

[13] John testified that Appellant's appearance was different in court from what it was at the time of the shooting. (RR3: 130-132,196; State's Exhibit 10).

*Robert Jones*

Robert testified that after Appellant arrived at the apartment, a few more drinks were consumed, a blunt was passed around, and everybody was having a nice time. (RR3: 216,251,257).

At one point Robert went into the bedroom of the apartment with Ida and two other men called "Shepp"[14] and "Unc."[15] (RR3: 217,221). While there, he heard a confrontation between Appellant and Charles that had to do with Appellant "trying to take…(Catherine)…off or something like that." (RR3: 217-218,262-264). Robert and John broke up the argument. (RR3: 264). Robert told Appellant "Hey, man, she is nothing." (RR3: 264). Robert did not see anything physical and did not think this argument was serious. (RR3: 218-219). Robert heard Appellant say "Man, we fixing to go." (RR3: 265-266). Charles sat back down on the couch, Appellant left, and Robert returned to his bedroom. (RR3: 220). It sounded to Robert like everything had died down. (RR3: 266).

---

[14] Robert did not know Shepp's real name. (RR3: 256). Shepp did not testify at trial.

[15] "Unc" was never identified by any other name; he did not testify at trial.

Robert, Ida, Shepp and Unc remained in the bedroom for five to seven minutes discussing "business."[16] (RR3: 259,266-267). Neither John nor Catherine were in the bedroom at this time packing Catherine's belongings. (RR3: 267-268). Robert had seen Catherine leaving the apartment as he headed back to the bedroom. (RR3: 284).

Robert heard two gunshots and looked out the window of the bedroom; he saw Charles laying on the ground and Appellant standing right by him with a gun in his hand. (RR3: 221,233,249,268-269,282,289). The gun was not raised but was "down on his side." (RR3: 269).

Robert heard someone say "he just shot my brother." (RR3: 223,270). As Robert ran outside, Appellant turned and fired his gun twice at Robert; Robert was shot in the hand. (RR3: 223-225,241,272,274,282). Appellant said nothing before he shot. (RR3: 275). Robert had nothing in his hand; specifically, he did not have a gun. (RR3: 272-273). Indeed, Robert testified that no one had a gun that night; if they had, "we would have used it." (RR3: 273).

Charles was lying on the ground on his back. (RR3: 225,231,269). He was breathing but was not responsive. (RR3: 226). Ida and Tony were attempting CPR.

---

[16] It was established, at a sub rosa hearing, that the business being discussed was the purchasing of marijuana from Shepp. (RR3: 260). The trial court, however, sustained the State's objection to this evidence. (RR3: 261).

(RR3: 242-243,276). Robert could not recall if John was outside at that time. (RR3: 214,276). However, it was Ida, and not John, that was holding Charles. (RR3: 277). Someone called 911 and an ambulance arrived. (RR3: 236,274).

Robert did not see Appellant shoot Charles. (RR3: 243, 287-289). He did not know what Charles said or did before the shooting. (RR3: 243). He did not hear an argument outside. (RR3: 275). Robert did not know what Charles was doing outside that night. (RR3: 290).

Robert did not speak to the police until later that day, when he was shown a photographic lineup. (RR3: 236,239-241; State's Exhibits 24-29). He selected a photograph from that lineup.[17] (RR3: 240-241; State's Exhibit 5).

### Catherine a/k/a "Cat" Deamon

Catherine testified that she had been sleeping in Robert's bed[18] when John told her to get up and come into the living room where some other people were hanging out. (RR3: 295-296). She heard arguing between John and Charles. (RR3: 297-298). Robert and Ida broke up this argument. (RR3: 312). Catherine did not know exactly what the argument was about, but she felt that it may have been about her. (RR3: 297, 302-304).

---

[17] Robert testified that Appellant looked different at trial than he did that night. (RR3: 235).

[18] Ida, however, testified that that Catherine was sleeping on the couch when they got back from the club. (RR4: 39).

11

Everybody, including Catherine, was getting ready to go to an after-hours club. (RR3: 298). When Appellant came in he said "Oh, this is who y'all was talking about?" (RR3: 298). Catherine walked away toward the back room, but Appellant followed her. (RR3: 298).

Catherine asked to use Appellant's phone to call her mother to come and get her. (RR3: 298). No one told Catherine to leave the apartment; she decided to do so of her own accord. (RR3: 316). Catherine testified that Appellant, Silk and Ceelo were "pimping at" her, *i.e.*, trying to get her to prostitute for them. (RR3: 298).

Catherine, Appellant, Silk, Ceelo and Charles were all outside. (RR3: 299). Silk and Ceelo were in their car and Silk told her to get in the car. (RR3: 299-301). Charles came over and started arguing with Appellant. (RR3: 299-300). Catherine gave Appellant his phone back and hurried into the apartment. (RR3: 301).

Once inside, Catherine heard gunshots. (RR3: 301). She heard someone, probably John, say "He done shot my brother." (RR3: 301,317,325). Robert ran outside and got shot in the hand. (RR3: 301, 302).

Catherine testified that she did not see a gun on anyone that night. (RR3: 304, 305). She did not witness the shooting. (RR3: 305). Rather, she was in the bedroom by herself at the time of the shooting. (RR3: 306). Robert was not in the bedroom. (RR3: 306). Everyone else was in the living room of the apartment. (RR3: 306). John was not outside when the shots were fired. (RR3: 318).

12

Catherine left the apartment before the police arrived, going to another apartment in the complex. (RR3: 318-319). She felt that everybody was mad at her, particularly Ida who was "cussing" and talking about her. (RR3: 319-320). Catherine later called John on the telephone while he was at the hospital. (RR3: 320. According to Catherine, John told her to go back to the apartment and wait. (RR3: 321). She never spoke to Robert again. (RR3: 321).

Catherine talked to the police and gave a statement, which the detective wrote for her.[19] (RR3: 303).

### Ida Jones

According to Ida, everyone was friendly at the apartment and she never saw or heard an argument inside the apartment. (RR4: 17,41,68,77). However, Ida also testified that she was told there had been an argument about Catherine between Robert and Charles, though she had no personal knowledge of the argument. (RR4: 42,77,86). Ida's understanding was that Robert had "given" Catherine to Charles because the dancer had come back from the club with him. (RR4: 54). She did not hear about an argument between Charles and Appellant. (RR4: 86).

Ida said she was not drinking but did not know if others might have been. (RR4: 38). No one was smoking a blunt. (RR4: 40).

---

[19] While this statement was discussed, it was not formally admitted into evidence.

Ida split her time between the living room, the outside porch and Robert's bedroom. (RR4: 17). She saw Charles sitting on the arm of the couch in the living room. (RR4: 17). Ida did not see Charles leave the apartment. (RR4: 18).

At one point when Ida was outside the apartment, she saw Catherine walk outside the apartment and get into the passenger's side of Appellant's vehicle. (RR4: 46,69). Ida went back inside the apartment and did not see Catherine get out of Appellant's car. (RR4: 46,67).

Ida was in the bedroom with Robert, Shepp and Unc when she heard gunshots. (RR4: 18,52,55). Robert said "Charles," then ran outside; everybody followed him. (RR4: 19). Once outside, Ida saw Appellant standing by his car with the car door open; he turned his gun towards the group and started shooting. (RR4: 19-20).

Ida ducked when Appellant fired and was pushed back into the doorway by others. (RR4: 21). A bullet grazed Robert's hand. (RR4: 21). When Ida went back outside, she saw Charles on the ground. (RR4: 20). She did not see Appellant shoot Charles. (RR4: 70). Ida heard John say "[t]hat ho ass nigger shot my brother." (RR4: 50-51,57-58,63,71).

Charles was breathing at first, but then stopped breathing. (RR4: 22,32). Ida and Tony attempted to resuscitate Charles. (RR4: 22,32-33). Nothing was in Charles' hand. (RR4: 62). Ida remained with Charles, along with Tony and Robert,

until the ambulance arrived, then drove to the hospital with Tony and Alexia. (RR4: 22-23,26,66).

Ida gave a statement to Detective Ned.[20] (RR4: 27). She later selected Appellant's photograph from a photographic lineup. (RR4: 28-31; State's Exhibits 24-29,59-64).

*Alexia (Alexis) Davis*

At the apartment, Alexia witnessed an argument between Appellant and Charles. (RR4: 98). The argument started about Catherine, though Alexia did not know who started it. (RR4: 120). According to Alexia, "it came down to was about Charles was trying to tell him (Appellant) that he couldn't come in and try to take Robert's female." (RR4: 98). Robert and John ended the fight, telling Appellant and Charles that there "wasn't no use to be fighting over no female." (RR4: 124). The argument cooled off and they got a drink and went outside. (RR4: 99,127). They came back in when Silk and Ceelo arrived. (RR4: 127).

Alexia did not think that this was a serious argument. (RR4: 99). However, Alexia also testified that she was in her "own world" at the time, *i.e.*, sitting down, having a drink and enjoying herself. (RR4: 122). Robert was in the back bedroom

---

[20] Ida's statement to the detective differed from her testimony at trial. She claimed that she told the detective a number of things that were not included in her statement. (RR4: 64,72-74). Her statement was identified as State's Exhibit 74, but was never formally introduced at trial.

"because he always stayed in the back, either sitting on the bed or watching TV or something." (RR4: 149).

Alexia was sitting inside the apartment on the couch when she heard a gunshot. (RR4: 100,128). Alexia paid no attention to the first shot, because she was in "the hood" and it was common to hear shooting every day. (RR4: 100,128,130). Alexia sat down on the couch, but got right back up again as "something told me to get up and go outside." (RR4: 100-103,133-135). Alexia saw Appellant standing by the open door of his car and close to Charles with a handgun. (RR4: 100-104, 136-137). Charles was bent over holding his stomach; he fell to the ground when the second shot was fired. (RR4: 100-101,136-138). Alexia did not hear Appellant, who had the gun pointed at Charles, say anything before firing the second shot. (RR4: 109,137-138). Alexia saw nothing in Charles' hand. (RR4: 101). She saw no one else with a gun and saw no one take anything from Charles. (RR4: 101,105-106).

Alexia yelled to the others, particularly to John– "he shot your brother" – and ran back towards the inside of the apartment. (RR4: 102,108,138). Everybody came out and Appellant began shooting at them. (RR4: 101-102,139-140). Robert was hit or grazed in the hand. (RR4: 102-103). Appellant and the other car drove off as sirens could be heard in the distance. (RR4: 104,140-142).

The first person to get to Charles was Ida. (RR4: 143). John was walking around crying and confused. (RR4: 144). John never touched Charles because Ida prevented him from doing so. (RR4: 147). Robert and Alexia went across the street to direct the ambulance. (RR4: 141-142). Alexia went to the hospital with Ida and Tony. (RR4: 145).

Alexia did not give a formal statement to the police, though she spoke with an officer briefly at the scene, giving them a description of Appellant.[21] (RR4: 110-112).

*Tony Hoyle*

Tony was asleep on the couch in the living room when the others returned from the club. (RR5: 129). He woke up, but continued to lay on the couch with his eyes closed trying to sleep; he was ready to leave and was not paying much attention to the others in the apartment. (RR5: 129-131,138,142-143). No one was drinking or smoking marijuana. (RR5: 130-131).

Tony heard an argument between Charles and another person. (RR5: 130). Tony did not see Charles leave the apartment, nor did he hear any shooting before he walked outside. (RR5: 133-134,145). He heard John yell "Don't shoot my brother." (RR5: 133-134). Tony did not see Charles get shot, nor did he see

---

[21] Alexia testified that she did not speak to the police at the hospital because she was mad about Charles getting shot; further, the police did not ask to speak to her. (RR4: 113, 114, 115).

Appellant shoot Charles. (RR5: 131-132,162). Tony did see Appellant shoot at the group of people on the porch. (RR5: 133-135). He heard two gunshots. (RR5: 160). He recalled that Appellant was standing right in front of Charles. (RR5: 160).

Tony and Ida were the first people to get to Charles. (RR5: 131-132). Charles was breathing at first, but then he stopped. (RR5: 152). Tony did not see any items in Charles' hands and did not pick any items up. (RR5: 132,152). John was standing beside Tony and Ida saying "Don't die. Don't die." (RR5: 132). Tony stayed with Charles until the ambulance arrived and performed CPR. (RR5: 136,150-152,159).

Tony, Ida and Alexis all went to the hospital in Tony's truck. (RR5: 150). Tony did not speak to the police at the hospital. (RR5: 134). Tony later contacted the police after finding a bullet fragment on the seat in his vehicle. (RR5: 136,149, 151,158; Defense Exhibit 9). There was a tear in the black jacket he had been wearing that night which he gave to the detective. (RR5: 136,153,155). Tony had not previously noticed the tear in the jacket. (RR5: 155). Tony did not find any bullet holes on the outside of his truck. (RR5: 156).

Tony gave the police a statement, which was admitted as Defense Exhibit 8.[22] (RR5: 139).

---

[22] In his trial testimony, Tony disavowed portions of this statement. (RR5: 140-148).

## *Appellant's Testimony*

Appellant testified that he went to the Under the Bridge Club by himself at about 12:45 a.m. on March 2, 2005. (RR5: 41-43). Appellant was driving an Impala that he borrowed from a friend, Chris Haynes.[23] (RR5: 43,81).

Appellant saw Charles inside the Club. (RR5: 44). Appellant had known Charles for about a year and a half and saw him periodically, though they had never really done anything together. (RR5: 44,49-50). Indeed, Appellant had last seen Charles 6-7 months previously at a club in North Dallas. (RR5: 45). Charles said he was with some friends at the club, but he was alone when he spoke with Appellant. (RR5: 46).

Appellant stayed at the club until it closed. (RR5: 46). While driving away, he had a brief encounter with Charles, who invited Appellant to come back to his apartment. (RR5: 47-48). There were a lot of people in Charles' car. (RR5: 47). Charles told Appellant that he had "some ladies in the car and a few ladies at the house, and they down for whatever." (RR5: 47-48). Appellant understood that to mean: "Basically about anything. Maybe just toss up, toss up me, like as far as like ménage a trois at the house or something more like exotic things because he was

---

[23] Chris Haynes did not testify at trial. Appellant testified that he owned a Lexus. (RR5: 43,78).

saying they were dancers from the club." (RR5: 48). According to Appellant, Charles was "pretty much intoxicated." (RR5: 50).

Appellant followed Charles to the apartment. (RR5: 48-49). While doing so, he called a friend known as Silk to "let him (Silk) know that this guy (Charles) has got a lot of girls in the car and they down for whatever." (RR5: 48-49).

Everybody went into the apartment before Appellant. (RR5: 50-51). Once in the apartment, Appellant talked to three women. (RR5: 52). He offered to take everyone to an after-hours club and pay for the drinks. (RR5: 55). As far as he knew, everyone was going. (RR5: 56).

Appellant asked Robert if he could use the restroom, which had to be accessed through the bedroom. (RR5: 55). When he came out he saw Catherine in the bedroom arguing with John. (RR5: 55). She wanted to go to the after-hours club and John wanted her to leave the apartment. (RR5: 55-56). Indeed, John asked Catherine "You about to leave with this pretty boy ass nigger?" (RR5: 56). Appellant asked why this was a problem and John told him to stay out of his business. (RR5: 56). Appellant returned to the living room. (RR3: 56).

Appellant's friend, Silk, arrived with Ceelo, a man Appellant did not know. (RR5: 57). Appellant introduced Silk and Ceelo to Robert and to the ladies. (RR5: 58). By now, there were at least a dozen people in the apartment. (RR5: 57). Silk

and Ceelo both said they knew Catherine; Silk was trying to talk to Catherine. (RR5: 58-59).

Charles came up to Appellant and said they were not going to the after-hours club. (RR5: 59). His demeanor was "like arrogant a little bit." (RR5: 59). Appellant replied: "You know, I could have been gone. Y'all waste my time sitting and waiting on y'all. I think y'all getting ready to go to the after hour." (RR5: 59). The conversation thereafter was as follows:

A. He just said, "Well, man, we ain't going". And I said, "Well, all right, cool".

Q. So what do you do at that point?

A. When he said that, when I said cool, I asked him, "What about the ladies, the ladies don't want to go"?

Q. Okay. Did he reply?

A. "They ain't going nowhere neither"

Q. Okay. And then what happened?

A. As a result of that, he walked up on me….he stepped to me. And when he stepped to me, he was like, "Man, ain't nobody going nowhere".

(RR5: 60). Appellant gave Catherine his phone number and he left. (RR5: 60). Silk and Ceelo had already left just before him. (RR5: 60). No one asked them to leave and no one ushered them out of the apartment. (RR5: 61).

21

It was raining outside. (RR5: 61). Appellant got into his car while Silk and Ceelo got into their car, which was parked right behind Appellant's car. (RR5: 61). Silk and Ceelo "kind of went around me" in their car and "was sitting in the middle of the street in their car" when Catherine came outside and flagged Appellant down. (RR5: 62). Catherine said she wanted to go and got into the passenger seat of Appellant's car. (RR5: 62). Referring to the people in the apartment, Catherine said "[t]hey in there tripping;" she wanted to go to the after-hours club and did not know why the people in the apartment did not want to go. (RR5: 63).

As Appellant was getting ready to pull out, Charles ran outside and jumped in front of Appellant's car. (RR5: 63). Charles "appeared to have something" as he kept his hand behind his back the entire time he was speaking to Appellant. (RR5: 64). Appellant testified that "it was going through my mind that he might have a gun." (RR5: 65). Indeed, Appellant had known Charles to carry a gun. (RR5: 65). Appellant got a gun that he had borrowed from a friend out of the console of the car and put it on the top of the car seat. (RR5: 70-71).

Charles said to Appellant: "Let this bitch up out this car. This bitch ain't going nowhere." (RR5: 64). Appellant asked Catherine to get out of the car because he did not want any trouble. (RR5: 64). When Catherine got out, Charles directed or escorted her to the sidewalk area. (RR5: 65,68).

22

At this point, Appellant saw John outside. (RR5: 66). Appellant realized that Catherine, who had asked to use his phone, still had his phone in her possession. (RR5: 68). Appellant pulled his car up a little bit and asked Charles "Man, what's happening, man? What's going on, man?" (RR5: 68). Charles replied: "Nothing going on. This bitch just ain't fixing to go anywhere." (RR5: 68). Appellant asked if he could get his phone back. (RR5: 69). John snatched the phone from Catherine and threw the phone to Appellant. (RR5: 69). John then slapped Catherine and "told her to go on and get in the house." (RR5: 69). When Appellant bent down to pick up his phone, Charles "came up running back with a gun" and said "Well, you can take this with you too." (RR5: 69-72).

Charles "came from around his back with a gun." (RR5: 70). Appellant heard a shot. (RR5: 71). He ducked down and picked up his gun because he thought Charles was going to shoot him. (RR5: 71-72). Appellant shot twice, jumped in his car, and drove off. (RR5: 71,73). Appellant heard more shots being fired as he drove away. (RR5: 73).

There was no argument before Charles fired the first shot. (RR5: 70-72). Appellant did not aim at anybody. (RR5: 72). He did not shoot at the other people outside. (RR5: 72). He shot in Charles' direction to "maybe prevent him from shooting again." (RR5: 72). Appellant had no time to think and was simply reacting. (RR5: 72). He was not trying to kill Charles or anyone. (RR5: 72).

23

The next morning, Appellant discovered that the shot Charles had fired had "went into the side of the door" of the car he was driving.[24] (RR5: 72). Appellant gave both the borrowed car and the borrowed gun back to the owner of those items. (RR5: 74,93). About three weeks later he learned that Charles had died. (RR5: 73). Appellant was arrested several weeks later. (RR5: 74). Appellant was never interviewed by the police. (RR5: 74).

## SUMMARY OF ARGUMENT

**Issue 1:** The State failed in its burden of persuasion to refute the defense at trial that Appellant acted only in self-defense. Hence, the evidence is legally insufficient to support the jury's implied rejection of Appellant's self-defense claim.

**Issue 2:** As an alternative to Issue 1, the evidence will support a verdict of manslaughter due to Appellant's reckless conduct in discharging a firearm.

**Issue 3:** A critical exhibit, utilized at trial by both the State and the defense, was destroyed through no fault of Appellant's and cannot be reproduced. Should this Court reject Appellant's arguments under Points of Error 1 and/or 2, then Appellant submits that the sufficiency of the evidence with respect to Appellant's

---

[24] Appellant did not take any photographs of this bullet defect in the car. (RR5: 108). Appellant told Haynes "that a dude was shooting at me last night," but did not give him any other details. (RR5: 108-109).

alternative claims of self-defense and manslaughter cannot be properly evaluated without this exhibit.

**Issues 4 & 5:** The trial court sustained three defense objections to questions posed during the State's cross-examination of Appellant which were designed to elicit evidence of an extraneous offense of drug dealing. While the trial court instructed the jury to disregard on two occasions, the trial court also denied two requests for a mistrial. The repeated and prejudicial nature of the questioning constituted improper impeachment and mandated a mistrial.

**Issue 6:** Appellant was entitled to a hearing on his motion for new trial which contained sworn allegations of favorable, material evidence that had been discovered after trial. This evidence, upon which Appellant could be entitled to relief, was not otherwise determinable from the record.

**Issues 7, 8 & 9:** At punishment, the prosecutor argued that the jury should place themselves in the "shoes of the victim" to consider what sentence the victim and his family would want imposed on the defendant. The prosecutor also argued that the jury needed to "speak for the community." Objections to these arguments were erroneously overruled twice. While one objection was sustained and the jury was instructed to disregard, these actions were insufficient to cure the error and a mistrial should have been granted.

**Issue 10:** The judgment should be modified to correct inaccuracies therein.

# ARGUMENT

## Point of Error 1, Restated

***The State failed in its burden of persuasion to refute Appellant's proof of self-defense; hence, the evidence is legally insufficient to support the jury's murder verdict.***

The defense at trial was that Appellant acted in self-defense. Because the State failed in its burden of persuasion on the issue of self-defense, the evidence is legally insufficient to support the jury's implied rejection of Appellant's self-defense claim.

## Self-Defense

A person is justified in using force against another when and to the degree he reasonably believes that force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX. PENAL CODE §9.31(a). A person is justified in using deadly force against another if he would be justified in using force under Section 9.31 and the following additional requirements are satisfied:

> (2) if a reasonable person in the actor's situation would not have retreated; and
>
> (3) when and to the degree he reasonably believes the deadly force is immediately necessary:
>
>> (A) to protect himself against the other's use or attempted use of unlawful deadly force.

TEX. PENAL CODE §9.32. The "apparent danger" doctrine allows a person to defend himself from apparent danger to the same extent as he would if the danger were real; therefore, no evidence is necessary to show that the aggressor was actually using or attempting to use deadly force. *See Semaire v. State*, 612 S.W.2d 528, 530 (Tex. Crim. App. 1980).

**Legal Sufficiency and Self-Defense**

A defendant has the initial burden of producing sufficient evidence to raise the issue of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The State's burden is one of persuasion, *i.e.*, to persuade the jury beyond a reasonable doubt that the defendant did not act in self-defense. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). A jury verdict of guilty in a homicide is an implicit finding rejecting the defendant's self-defense theory. *Id.* at 914.

**Jury Charge**

The trial court instructed the jury on the law of self-defense and apparent danger. (CR1: 67). The court's charge authorized acquittal if the jury found from the evidence, when viewed from Appellant's standpoint, that Appellant believed he was in either real or apparent danger. (CR1: 68). While the trial court did not provide a separate instruction on apparent danger, the jury was properly instructed that Appellant had the right to defend from apparent danger to the same extent as he would have had the danger been real, as it appeared to him from his standpoint

27

at the time. *See Jones v. State*, 544 S.W.2d 139, 142 (Tex. Crim. App. 1976). The jury impliedly rejected the defense of self-defense and returned a verdict of an intentional murder. (CR1: 74).

**Application of the Law to the Facts**

*Inconsistent Testimony from the State's Witnesses*

As defense counsel noted in final jury argument, not "one single" witness for the State told the same story. (RR5: 182). Their inconsistent testimony also often differed significantly from the statements and affidavits taken by the police, none of which were introduced into evidence by the prosecution.

While these inconsistencies were dismissed by the State as of no consequence, (RR5: 177), the inconsistencies are important, particularly with respect to the events leading up to the shooting, as they bear on motive and intent, or the lack thereof. These inconsistencies are also relevant to any threats Charles may have made or actions Charles may have taken against Appellant in the moments leading up to the shooting.

- There was no agreement as to which members of the group planned to go to the after-hours club with Appellant. John testified that Charles and Appellant were going to an after-hours club but no one else was while Robert thought everyone was going. (RR3: 97-98,159,160,214,253-254). Catherine wanted to go to the after-hours club. (RR3: 298). Ida was planning to go, as Appellant was paying for the drinks. (RR4: 43-45). Alexia was planning to go if the others went. (RR4: 144).

28

- There was no agreement as to the consumption of drugs and/or alcohol in the apartment after returning from the club. Robert testified that everyone had a few more drinks and a blunt was passed around. (RR3: 216,251,257). Alexia was drinking. (RR4: 122- 123). Ida was not drinking but did not know if others might have been; no one was smoking a blunt. (RR4: 38-40). Tony testified that no one was drinking or smoking marijuana. (RR5: 130-131).

- There was no agreement as to collateral people (who did not testify) who may have been in the apartment. Appellant testified that at least a dozen people were there, yet only six testified. (RR5: 57,86). Robert and Ida testified that Shepp and Unc were there. (RR3: 217,221,259,266-267; RR4: 52). Alexia only saw Ida, Robert and Catherine in the bedroom. (RR4: 121).

- There was no agreement as to who was where, and what they were doing, inside the apartment when the shooting occurred. John testified that he was standing in the doorway of the bedroom where Ida, Robert and Catherine were. (RR3: 112,178,202). Catherine testified that she had just walked back into the apartment from being outside and was in the bedroom alone; everyone else was in the living room. (RR3: 301,306). Robert and Ida testified that they were in the bedroom with Shepp and Unc; neither John nor Catherine were there. (RR3: 259,266-268; RR4: 52).

- There was no agreement as to whether Catherine was leaving the apartment of her own accord or was being forced to leave. Catherine testified that she had decided to leave. (RR3: 316). John testified that Ida told Catherine she needed to leave. (RR3: 111).

- There was no agreement as to the participants in the argument over Catherine. John testified that the argument was between Robert, Charles and Appellant; he broke it up. (RR3: 106-109,172). Robert testified that the argument was between Charles and Appellant; he and John broke it up. (RR3: 217-218,262-264). Catherine testified that she heard an argument between John and Charles; Robert and Ida broke it up. (RR3: 297-298,312). Ida testified that the argument was between Robert and Charles. (RR4: 42,77,86). Alexia testified that the argument was between Charles and Appellant; Robert and John broke it up. (RR4: 98,120,124). Tony heard an argument between Charles and another person. (RR5: 130).

29

- There was no agreement as to where John was after the shooting. John said he was holding Charles. (RR3: 117,136). Robert could not recall where John was, but he was not by Charles. (RR3: 214,276-277). Alexia testified that John was walking around crying and confused; he never touched Charles. (RR4: 144). Ida and Tony both testified that John was with them as they performed CPR on Charles. (RR4: 22,32-33; RR5: 132).

In contrast, Appellant's testimony was clear and unequivocal that Charles tried to stop Appellant from leaving with Catherine and that Charles had a gun, which he fired first at Appellant. (RR5: 70-72) Appellant shot in Charles' direction only to protect himself; he did not intend to kill anyone. (RR5: 72).

### *Apparent Danger*

Several witnesses testified that Charles did not have a gun. (RR3: 117-118,272-273,304-305; RR4: 70-71,101). Even if that testimony was true, which Appellant does not concede, that does not negate the apparent danger that Appellant could have believed he was in. Appellant had known Charles to carry a gun in the past. (RR5: 65). Charles had his hand behind his back, which caused Appellant to believe he had a gun. (RR5: 65). Appellant also knew that Charles was intoxicated[25] at this time and was trying to stop him from helping Catherine leave. (RR5: 50).

---

[25] Charles' blood alcohol level was measured at .19 percent and the level of alcohol in his vitreous was measured at .16 percent; both are double or better the .08 legal level of intoxication. (RR4: 202,213).

Robert testified that no one had a gun that night. (RR3: 272-273). However, as defense counsel noted in final jury argument, these were all Charles' friends and family, their credibility was questionable, and they all had a motive to lie. (RR5: 183,186,188). It was Appellant who was the outsider. Moreover, it strains logic to believe that, in a large group of people who had been engaging in drug usage, *absolutely no one* had a gun in the apartment. This is especially true in light of the fact that Charles was known to carry a gun.

Only one witness, Alexia, testified that she actually saw Appellant shoot Charles. (RR4: 109,137-138). All the others merely testified that they saw Appellant either in close proximity to Charles or standing over him with a gun and did not witness the actual shooting. (RR3: 182,221,233,235,269,289,304-305). What Alexia saw merely could have been Appellant shooting in Charles' direction. Indeed, the exact vantage point of the witnesses cannot be evaluated on appeal due to the destruction of State's Exhibit 23, a large blown up photograph on which various witnesses were asked to pinpoint their location, as well as Charles' and Appellant's location. *See* Point of Error 3, *infra*. It is entirely possible that none of the witnesses were in a position to see the gun in Charles' hand.

### *Ballistics/Gunshot Residue*

From the firearm evidence alone, it cannot be determined that there were not at least two guns at the scene of the shooting, which would justify Appellant's belief that he was in real or apparent danger.

The one point on which most of the State's witnesses could agree was that they heard at least two gunshots. (RR3: 221,249,269,282; RR4: 18,52, 55,100,128,136-138). Appellant admitted that he shot off two rounds. (RR5: 71-73). Indeed, two fired cartridge cases were found at the scene. (RR3: 70-73; RR4: 182); yet, Charles was shot only once, which indicates Appellant was not aiming at Charles, intending to kill him, or even to cause him serious bodily injury. At best, Appellant was reckless about discharging his firearm in Charles' direction. *See* Point of Error 2, *infra*.

There was confusion over just how many bullets were fired that night. Raymond Cooper, a firearm and tool mark examiner, received two .45 caliber fired cartridge cases. (RR4: 182; State's Exhibit 33). Based on unique tool marks, he was able to determine that both of these bullets had been fired from the same weapon. (RR4: 184-186). However, he did not receive a gun with which to compare these cartridges. (RR4: 186-187). In addition to these two cartridges, Tony delivered a "copper part of a bullet fragment" which had fallen out of his jacket in his vehicle to Detective Ned. (RR5: 18,34). Six days after the shooting,

Ned discovered an additional bullet fragment in a flower bed. (RR5: 23,26). The bullet core had no markings and was of no value for firearms identification, while the bullet fragment was consistent with a .45 caliber bullet, the same caliber of bullet as the shell casings analyzed. (RR5: 166-168). Cooper could not determine, however, if the core came from the fragment and admitted that more than one gun could have distributed both items. (RR5: 170).

It is true that no gunshot residue was found on Charles' hands. (RR4: 158). However, it was raining very hard when the police arrived. (RR3: 37,60-61). Rain[26] is the equivalent of a hand washing, which will remove gunshot residue. (RR4: 158,172).

### *Lack of Motive*

The State failed to provide any evidence of a motive as to why Appellant would have reason to shoot Charles unless Appellant was in fear of his life. There was no evidence that Appellant was there to buy, sell, or otherwise deal drugs, nor any evidence that this shooting was the result of a drug deal gone bad. *See* Points of Error 4 & 5, *infra.* Nor did the jury have evidence that Appellant was trying to take Catherine away from the apartment against her will; Catherine testified that

---

[26] The State's expert, David Wayne Spence, learned just prior to his testimony that it had been raining hard the night of the shooting. (RR4: 173,175).

she wanted to leave their apartment of her own accord. (RR3: 293-294,316). Charles could have been annoyed that Catherine wanted to leave with Appellant because, as defense counsel suggested, Charles, John and Robert, none of whom were working, were all making their money from "running" Catherine as a prostitute and, if she left with Appellant, they would lose their source of income. (RR5: 191-194). That would have given Charles ample motive to try and stop Appellant.

### *Inadequate Police Investigation and Preparation*

Only two police officers testified: Christopher Walton, one of the first officers on the scene, and Detective Marvin Ned, the lead detective.

Walton did not obtain statements from the witnesses at the scene; rather, he spoke briefly with Alexia, Tony, and Robert who essentially gave him only a description of the shooter. (RR3: 23,25-26,42,44-45). Ned took statements from Ida and Tony after Charles died. (RR3: 78; RR5: 8-14,31,139-147). These statements were not formally introduced into evidence, though there was substantial evidence that the testimony of both Ida and Tony differed from what they told the police. (RR4: 64,72-74; RR5: 140-148). Statements were not obtained from Robert, John, Alexia, Catherine or Appellant.

The police also failed to adequately secure the scene of the shooting. The only evidence recovered on the night of the shooting were two .45 caliber spent

34

shell casings. (RR3: 70-73,81). Six days after the shooting, Ned discovered a bullet fragment in a flower bed outside the apartment, which had obviously been missed by detectives who had been sent to the scene the morning after the shooting. (RR5: 23,26,29). Ned's report, however, did not reflect this discovery. (RR5: 23). If a bullet could be missed by detectives at the scene of the shooting, one wonders what other evidence was missed. The police investigation into this shooting was wholly inadequate.

During trial, it was discovered that a second ballistics report had been prepared on evidence other than the two cartridge cases. (RR4: 190). The defense was not informed of this report, in violation of the trial court's discovery order.[27] (RR4: 190). All parties agreed to a recess in the trial so that the objects which were the subject of this second report could be sent to an independent expert in San Antonio for analysis. (RR4: 219). The results of this analysis do not, however, appear in the appellate record.[28]

The State's ballistic expert, David Spence, did not originally include an estimate of the range of fire of the lethal bullet that killed Charles because it was

---

[27] The trial court specifically found that the State was not intentionally at fault. (RR4: 190). Though the defense moved for a mistrial, no ruling on that motion appears in the record. (RR4: 191).

[28] After this discovery, the State offered Appellant a sentence of seventeen years if he would plead guilty. (RR5: 5). Appellant rejected the plea bargain. (RR5: 5-6).

standard procedure not to "report range of fire in a report unless we have a weapon that we can test fire and perform distance testing test shots." (RR4: 169, 170). Nevertheless, he was asked to give his opinion on this issue a few hours before his trial testimony.[29] (RR4: 169). He based his opinion on gunshot residue particles on Charles' clothing even though the medical examiner's report contained no evidence of an estimated range of fire because there was no gunshot residue on Charles' skin from which such a conclusion could be drawn. (RR4: 165-167,211).

## Conclusion

When all the facts of this case are considered, it cannot be said, beyond a reasonable doubt, that Appellant did not shoot Charles in self-defense. Indeed, the State's evidence fails to refute the testimony that Appellant acted only in self-defense as a reaction to either real or apparent danger. Because the State failed in its burden of persuasion, Appellant is entitled to an acquittal.

**Point of Error 2, Restated**

***The evidence will support a conviction for manslaughter***.

The evidence in this case will support a verdict of manslaughter, a lesser included offense of murder. The jury was, in fact, charged on manslaughter as a

---

[29] Defense counsel asked for a mistrial on the basis that Spence's opinion constituted surprise, as it was not contained in his written report. (RR4: 191). The record does not reflect that the trial court made a ruling on the mistrial request.

lesser included offense to murder. (CR1: 70).

## Standard of Review

This Court must review all of the evidence, in the light most favorable to the verdict, to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Indeed, "it is the obligation and responsibility of appellate courts to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *White v. State*, No. 05-08-00241-CR, 2011 Tex. App. LEXIS 9332 at *16-17 (Tex. App.—Dallas November 22, 2011, pet. ref'd) (not designated for publication) (*quoting from Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010)). If the State's evidence raises only a suspicion of guilt, even a strong one, then the evidence is insufficient to support conviction. *Id*.

## Manslaughter vs. Murder

Under the facts of this case, the elements of manslaughter differ from murder only as to the requisite culpable mental state. Manslaughter requires proof that the accused acted recklessly. TEX. PENAL CODE §19.04(a). A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will

37

occur. TEX. PENAL CODE §6.03(c). Recklessness has been described as involving "conscious risk creation." *See Williams v. State*, 235 S.W.3d 742, 755 (Tex. Crim. App. 2007); *Stadt v. State*, 182 S.W.3d 360, 364 (Tex. Crim. App. 2005). Manslaughter is a "result of conduct" crime and, as such, the actor's recklessness must go to the conduct causing the death. *See Schroeder v. State*, 123 S.W.3d 398, 400-01 (Tex. Crim. App. 2003); *Gilbert v. State*, 196 S.W.3d 163, 166 (Tex. App. – Houston [1st Dist.] 2005, pet. ref'd).

Murder is also a "result of conduct" offense, which requires that the culpable mental state relate to the result of the conduct, *i.e.,* the causing of the death. *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (citing *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994)). Appellant was charged with an intentional and knowing murder. (CR1: 7). The law provides that a person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE §6.03(a). When committing an offense intentionally an actor exhibits a higher degree of criminal culpability than when committing an offense recklessly. TEX. PENAL CODE §6.02(d); *Guzman v. State*, 188 S.W.3d 185, 190 (Tex. Crim. App. 2006) (holding that a reckless mens rea is a less culpable state of mind than that of an intentional mens rea).

## Application of the Law to the Facts

Appellant admitted that he fired a gun in Charles' direction. While Appellant was reckless about discharging the gun, there is no evidence that he intended to kill Charles.

Appellant recognizes that a jury can infer intent to cause death or serious bodily injury from use of a deadly weapon in a deadly manner. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). To apply that inference in the case at bar, however, would be to ignore Appellant's testimony that he reacted in response to either being shot at by Charles or thinking that Charles had a gun and was planning to shoot him. Moreover, the jury was not charged on this presumption. A proper verdict in this case was that, if Appellant was guilty of a crime, he was guilty of manslaughter as opposed to murder.

## Proper Remedy: Reform and Remand

The jury was properly charged on the lesser included offense of manslaughter. (CR1: 70). Consequently, this Court, upon finding that the evidence is insufficient to prove an intentional killing, should reform the judgment to reflect an acquittal for murder and a conviction for the lesser included offense of manslaughter. *See Collier v. State*, 999 S.W.2d 779, 782 (Tex. Crim. App. 1999), *overruled on other grounds, Bowen v. State*, 374 S.W.3d 427, 428-429 (Tex. Crim. App. 2012). Because reckless homicide carries a lesser penalty than murder, TEX.

PENAL CODE §§12.33, 19.04, this Court should remand for a new punishment hearing.

## Point of Error 3, Restated

### *Appellant is entitled to a new trial because a critical exhibit was destroyed through no fault of his own*.

During trial, State's Exhibit 23,[30] a large blown-up photograph, was utilized extensively by witnesses as a "map" to indicate to the jury where they were in relation to Charles and Appellant at the time of the shooting. Witnesses also testified from this map that Charles and Appellant were located "here" or "there" outside the apartment. Several witnesses were asked to place initials on this exhibit. The exhibit was shown to the jury and the State relied on this exhibit in jury argument.

After trial, but before Appellant was granted an out-of-time appeal, all exhibits[31] in the custody of the District Clerk's office, including State's Exhibit 23, were destroyed.[32] (CRSupp: 6,9). In findings entered pursuant to an abatement

---

[30] State's Exhibit 23 was a blown up photograph of State's Exhibit 21, a photograph of the outside of the apartment. (RR3: 124). The witnesses were not, however, asked to place any markings on State's Exhibit 21.

[31] The only exception was State's Exhibit 75, an exhibit of hazardous waste. (CRSupp: 6,9).

[32] The exhibits which were filed with the Court of Appeals were copies of the original exhibits retained by the court reporter who anticipated that there would be an appeal in this case. (CRSupp: 6,8).

40

order by this Court, the trial court specifically found that the exhibit had been destroyed, could not be reproduced, the parties could not agree on a substitute, and that Appellant was not at fault for this destruction. (CRSupp: 6,7). Because State's Exhibit 23 is a crucial exhibit, which impacts Appellant's ability to challenge the sufficiency of the evidence on appeal, a new trial is required.

## The Lost or Destroyed Record Rule

Where a portion of an appellate record has been lost or destroyed, a new trial is mandated under the following conditions:

(1) if the appellant has timely requested a reporter's record;

(2) if, without the appellant's fault, a significant exhibit or a significant portion of the court reporter's notes and records has been lost or destroyed….;

(3) if the lost…or destroyed exhibit is necessary to the appeal's resolution; and

(4) if the lost (or) destroyed (exhibit) … cannot be replaced by agreement of the parties, or the lost or destroyed exhibit cannot be replaced either by agreement of the parties or with a copy determined by the trial court to accurately duplicate with reasonable certainty the original exhibit.

Tex. R. App. P. 34.6(f).

Appellant recognizes that an incomplete record does not automatically demand a reversal. *See Issac v. State*, 989 S.W.2d 754, 756 (Tex. Crim. App. 1999). Rather, a harm analysis is required. *Id.* at 757. Appellant must establish that

41

the missing portion of the record is necessary to the appeal; but, if so, a new trial is required. *Nava v. State*, 415 S.W.3d 289, 306 (Tex. Crim. App. 2013) (*citing Routier v. State*, 112 S.W.3d 554, 571 (Tex. Crim. App. 2003)); *see also Osuch v. State*, 976 S.W.2d 810, 812 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (concluding a destroyed videotape of a driver performing field sobriety tests was "necessary to the appeal's resolution" because the driver challenged whether a custodial interrogation occurred during his performance of the tests).

Where, as here, an appellant complains that the evidence is insufficient to support a finding of guilt, the record must include all the evidence admitted at the trial on the issue of guilt or innocence and punishment. TEX. R. APP. P. 34.6(c)(5). Without State's Exhibit 23, Appellant's ability to challenge the sufficiency of the evidence is severely limited. *Martin v. State*, 13 S.W.3d 133, 140 (Tex. App.—Dallas 2000, no pet.).

**Exhibit Destroyed in Violation of Time Limits for Record Retention**

Appellant anticipates that the State may argue that he failed to timely request a reporter's record. As the trial court found, no written request for preparation of the record, addressed to the court reporter, is apparent from the available trial court's electronic file prior to November 18, 2014. (CRSupp: 5). That, however, is not dispositive of whether Appellant timely requested a record.

Judgment was entered on May 25, 2006. (CR1: 43). What happened thereafter is a prime example of a case "falling through the cracks" of the criminal justice system. In both September and October of 2006, Appellant sent letters to the clerk's office and to the trial court inquiring about the status of his appeal. (CR1: 89,90,91-95,96; CRSupp: 4-5). Obviously, Appellant thought his case was on appeal. Ultimately, in 2007, Appellant filed a pro se writ of habeas corpus[33] requesting an out-of-time appeal; that was granted on September 17, 2014. (CRSupp: 5). Notice of appeal was thereafter timely filed and appellate counsel was appointed on November 17, 2014. (CR1: 139; CRSupp: 5). A formal request for the court reporter to prepare the record was filed within 24 hours after the appointment of appellate counsel, *i.e.,* on November 18, 2014. (CR1: 140-141).

The district clerk's office destroyed the exhibits in this case on August 14, 2012, *i.e.*, during the pendency of Appellant's writ of habeas corpus requesting an out-of-time appeal.[34] (CRSupp: 6, 9). At the time, Appellant was pursuing all legal remedies available to him. Appellant is not at fault for the delays in the criminal

---

[33] An amended writ of habeas corpus, still requesting an out-of-time appeal, was filed by an attorney on April 20, 2012. (CRSupp: 5).

[34] A post-conviction writ of habeas corpus is filed with the clerk of the convicting court. TEX. CODE CRIM. PROC. art. 11.07 §3(b). The clerk's office was on notice that a writ and an amended writ, both requesting an out-of-time appeal, were pending.

justice system any more than he is at fault for the destruction of State's Exhibit 23. (*See* CRSupp: 7).

A court reporter is required to file the untranscribed notes of a proceeding not placed on appeal with the district court clerk. TEX. R. APP. P. 13.6. The district court clerk is obliged to retain those notes for *15 years* from the time they were filed. *Id*. Because the court reporter is also required to retain exhibits and file those exhibits with the clerk, TEX. R. APP. P. 13.1(c), the same time frame should apply to all exhibits.

State's Exhibit 23, along with other physical exhibits,[35] was destroyed (1) while in the custody of the district clerk's office, (2) prior to the expiration of 15 years, and (3) during the pendency of Appellant's writ of habeas corpus seeking an out-of-time appeal. It cannot be said that Appellant is at fault for not requesting preparation of the record at an earlier date. *See Banks v. State*, 312 S.W.3d 42, 45-46 (Tex. App. – Dallas 2008, pet. ref'd) (reversing and remanding multiple

---

[35] In addition to State's Exhibit 23, the following exhibits were also destroyed:

    State's Exhibit 11: a large map;
    State's Exhibit 12: a large aerial photograph;
    State's Exhibit 30: a gun residue kit;
    State's Exhibit 33: two shell casings; and
    Defense Exhibit 7a: a bullet.

(CRSupp: 6).

convictions for a new trial approximately eight years after conviction because the reporter's notes were not retained by the district clerk's office within the essential time limits).

## Why State's Exhibit 23 is Crucial

It is virtually impossible to ascertain the location of the parties at the time of the shooting in the absence of State's Exhibit 23. A review of the witnesses' testimony fails to provide essential guidance.

### *John Calhoun*

Q. Now I'm going to show you…State's Exhibit Number 23. Do you recognize this?

A. Yes, ma'am.

Q. What is that?

A. That's the apartment complex.

**

Q. Mr. Calhoun, your first name is John?

A. Yes.

Q. And if you will, please take this blue marker. And I want you to indicate for the jury *where you were* when you came out of the apartment after your brother had been shot. You said you got right outside of the door. How far did you get?

A. I got to *right here*.

Q. *Put a J there* for me.

(Witness complies).

\*\*

Q. J for John Calhoun. Okay. And then, if you would, with this red marker, *put a C where Charles Calhoun's body was laying*.

(Witness complies).

Q. And then with this green marker, I want you to put a D for *where* you saw the defendant standing.

(Witness complies).

\*\*

Q. How far do you think it is from that J to that D, if you can estimate? And step right over there *so they can see*.

A. No more than ten or fifteen feet.

(RR3: 124-126). The exhibit was also utilized during cross-examination by defense counsel:

Q. Now, *where* does your brother Charles park that Cadillac?

\*\*

Q. Looking here at State's Exhibit Number 23, *where* exactly would that have been?

A. You can't see it from *right there…*But you can see where he drove right through *there* and made a quick, like go to the right, *right here*.

Q. *Back here somewhere*?

A. Yes, it's right *there*, like I say, five feet from the fence, five or six feet from the fence.

Q. Over in *this area*?

A. Yes.

(RR3: 162) (emphasis added).

### *Robert Jones*

Q. [I]n State's Exhibit Number 23…Robert…you take this green marker and…just put an initial or an R for you -- for about *where* you were standing when you got shot when you came out the door.

A. Probably about *there*.

Q. About *right there*?

A. Uh-huh.

Q. Okay. And in this picture, can you tell *where* the defendant was standing?

A. Yes, he was *right in this area*.

Q. Okay. And *where* was Charles's body?

A. He was *right in this area*.

Q. Go ahead and *mark it*.

A. He was in *this area right here*.

Q. Okay. So when you came out the door and saw the defendant, you were about *this far away* from him?

A. That's correct.

(RR3: 233-234) (emphasis added).

### Catherine Deamon

Q. When you say y'all were outside, looking at State's Exhibit Number 23 here…*where* were y'all out there?

A. We was *right here*. We was inside the gate.

\*\*

Q. Okay. And…when…Charles came out, and then you say there was an argument. *Where* was the argument going on?

A. *Right here*.

(RR3: 315-316) (emphasis added).

### Ida Jones

Q. Ms. Jones, I'm going to show you…State's Exhibit Number 23…Do you recognize this?

A. Yes.

\*\*

Q. Can you step down for me for just a minute?

(Witness steps down).

Q. …[S]tand over here for me. *The jury is going to see this picture* and we are going to talk about it for just a minute.

So whenever you first heard the gunshots and came out the door…*where* is it that you came to before you saw the defendant with a gun…?

A. I was standing right *here*.

Q. Right *there*?

A. Right *here* at the corner.

Q. Right *there* at the corner?

A. Uh-huh.

Q. And if you would, take this red marker, *put an I for me for Ida Jones, your name, where you were standing.*

A. (Witness complies).

Q. Okay. That's *where* you were standing. And if you would, with this marker…*where* was it that you saw the defendant standing when he was over Charles's body?

**

A. And he was standing like *in the middle right there*.

Q. That's where you saw him?

A. Because the car door was open. He was standing right *there*.

Q. Go ahead and *put a D for me right there*, the defendant.

A. (Witness complies).

Q. And *where* was it…that you remember Charles being?

A. Charles was right *here*.

Q. That's *where* you remember seeing him?

A. That's *where* Charles was at.

Q. Okay. So this is your view from the doorway over *here*. And you said you saw the defendant standing…right *there*?

A. Uh-huh.

49

**

Q. And even though it was dark outside, did you get a clear view of…the defendant as he stood *there*?

A. Yes.

(RR4: 23-25) (emphasis added).

### *Alexia (a/k/a Alexis) Davis*

Q. Ms. Davis …State's Exhibit Number 23. Do you recognize this?

A. Yes.

**

Q. …[S]tep down from the stand and come over here on this side of me, *and we will let the jury see this*.

(Witness steps down from the witness stand).

Q. If you will, take this blue marker… if you will *put an A where you were* when you came outside…can you tell me how far you were standing when you saw the defendant?

A. Right *here*.

Q. Right *there*. And that's when you saw him with Charles?

A. Yes.

Q. And that's when you saw him pull the trigger for the second gunshot that you heard?

A. Yes.

Q. And…with this green marker, *put a D where you saw the defendant standing with the gun*.

50

A. Right *here*. And because the car was parked right *here*…and the door was open.

\*\*

Q. [I]f you would, with that same marker, *put a C where you saw Charles Calhoun standing*.

\*\*

A. Okay. He was about right *here*.

Q. That's *where* you saw him standing?

A. Yeah. Yeah, because I was standing right *here*…

\*\*

Q. You walked toward *this way*?

A. Yes.

\*\*

Q. Okay. And you don't remember *where* everyone else was?
A. T-Ray and Chika, they was standing *about right here*.

(RR4: 107-108) (emphasis added).

### *Tony Hoyle*

Q. Mr. Hoyle…State's Exhibit Number 23. Do you recognize this as the apartment on Pine Street?

A. Yes.

Q. Okay. And this is the door that you're speaking of *over here*, apartment 101?

51

A. Yes.

Q. Okay. When you came out of this door right *here*…this is *where* you first saw the defendant; is that correct?

A. Yes.

Q. And is this *where* you were when he shot at you?

A. Yes.

Q. Okay. Were you wearing the jacket when you were standing *there*?

A. Yes.

Q. So at this point in time, you have the jacket on as you come outside the door?

A Uh-huh.

Q Okay. *Where* was your truck parked? If you need to step down. *Where* was your truck parked?

A. Charles's car was parked *right here*, and I was on the other side.

(RR5: 156-157)(emphasis added).

### *Appellant*
*On Direct Examination*

Q. Looking at State's Exhibit Number 23 here. Are you initially parked up *here* or down *here* or *where*?

A. I initially parked right back *here*.

Q. Okay. You initially parked right back *here*?

A. Yes, sir.

52

Q. About *in the middle* of State's Exhibit Number 23?

A. Yes, sir.

Q. And *where* does he come from, Charles Calhoun?

A. Well, actually I really didn't see just *where* he was coming from. I just knew he come from *the direction*.

Q. Come from *this direction*?

A. Yes, sir. And before I knew it, he was in front of the car.

Q. All right. And so he's standing in front of the car *about right here or so*?

A. Yes, sir.

Q. Okay. And you say when she gets out, your car is *parked where*?

A. When she get out, I'm *right here*.

Q. You're *right here*?

A. Yes, sir.

(RR5: 66-67)(emphasis added).

### *Appellant*
#### *On Cross-Examination*

Q. Mr. McMillan, I'm going to show you…State's Exhibit Number 23. Show this jury what you're talking about.

(Witness steps down from the witness stand).

A. Right *here*, this was my car right *here*.

53

Q. Right.

A. My car is right *here*. I got my door sitting wide open. My door like this. I'm standing like this on the curb. When he threw the phone…He threw the phone down right *there*. And I reached down and I picked up the phone. The curb is right *here* and the phone is right *here*. So I reached down and picked up the phone. And when I raised up, that's when Charles Calhoun came behind his back with a weapon.

Q. You just testified that the phone hit the sidewalk.

A. Well, this the sidewalk. *I'm saying this the sidewalk, all this space.*

Q. This is the sidewalk right *here*?

A. Okay. Well, I'm saying *right here*, this the sidewalk, this the curb *right here*.

Q. Where is Charles standing?

A. Charles standing *about right here*.

Q. He's *over here* now?

A. Yeah.

(RR5: 103-104)(emphasis added).

Q. You just testified Charles Calhoun is standing as close to you as that fence post was, that fence post *right there* in State's Exhibit Number 23, that black fence *right there*, and then your car is parked *right there* on that curb, as close as that, he fired at you and it missed you?

A. Yes, he missed me.

(RR5: 110) (emphasis added).

54

### *Jury Argument*

The State also referred to the exhibit in jury argument:

> We know from the testimony that they were standing and *that the shooting took place right here on State's Exhibit Number 23*, right here in front of or, actually I guess if you look at the photo, just to the right of the entrance of the parking lot. I mean we know that.

(RR5: 177).

All of the "here" and "there" testimony begs the questions: where were the participants to the shooting and what, if anything, could these witnesses really see?

### **A New Trial is Essential**

Without State's Exhibit 23, it cannot be ascertained, with any degree of accuracy, exactly where "here" and "there" correspond to the actual location of the witnesses and the parties. The vantage point of those witnesses, who testified they did not see Charles with a gun, is crucial to evaluating Appellant's self-defense claim and, alternatively, whether Appellant is more properly convicted of manslaughter than murder. If Charles had a gun, then Appellant's self-defense testimony was improperly rejected. If Charles did not have a gun, then Appellant's testimony regarding apparent danger and, alternatively, his testimony vis-à-vis his reckless conduct was improperly rejected. Appellant's testimony as to where he was in relation to Charles and the other witnesses is crucial in evaluating both real and apparent danger as well as his intent, or lack thereof, to kill or injure Charles.

All the requirements for a reversal under Rule 34.6(f) have been met in this case. Appellant has been harmed by the absence of a crucial exhibit. This Court should reverse Appellant's conviction and remand for a new trial.

## Point of Error 4, Restated

***The trial court abused its discretion by denying Appellant's motion for mistrial following questioning of Appellant by the State regarding an extraneous offense. (RR5: 78-80).***

## Point of Error 5, Restated

***The trial court abused its discretion by denying Appellant's motion for mistrial following repeated questioning of Appellant by the State regarding an extraneous offense. (RR5: 78-80).***

### *(Jointly Argued)*

The State attempted, on three occasions, to elicit testimony from Appellant on cross-examination regarding an extraneous offense of drug dealing. While the trial court sustained all three of defense counsel's objections to this line of questioning, and instructed the jury to disregard on two occasions, the repeated and prejudicial nature of the questioning mandated the granting of a mistrial. The trial court's failure to do so constituted an abuse of discretion.

**<u>Facts</u>**

During the course of cross-examination, the following exchange occurred:

Q. (BY MS. DODDS) And what kind of a job did you have?

A. I was hustling, ma'am.

Q. I'm sorry?

A. I was hustling.

Q. You were hustling?

A. Yes, ma'am.

Q. What does that mean?

A. Hustling by any means. Maybe you can be hustling as far as like selling weed or maybe anything, gambling, things of that nature.

Q. What else?

A. You asking me what hustling is?

Q. What else were you doing to get money?

A. I was as well --

MR. ALLEN: Object to the relevance, the ambiguity of it, Judge.

THE COURT: I'll sustain the objection at this point.

Q. (BY MS. DODDS) Well, Mr. McMillan, you were driving around in a '93 Lexus and you were offering to pay entrance fees to a club that y'all were going to go to after hours and buy everybody drinks. Where did you get the money?

A. I was hustling, ma'am.

Q. You were hustling. You're a drug dealer, you gamble?

MR. ALLEN: I'll object, Judge. This is improper impeachment.

THE COURT: Sustain the objection.

57

MR. ALLEN: I ask the jury be instructed to disregard, Judge.

THE COURT: The jury will disregard the last question.

MR. ALLEN: Move for a mistrial.

THE COURT: That's denied.

Q. (BY MS. DODDS) You were selling weed?

A. Yes, ma'am.

Q. That's what you said.

MR. ALLEN: Judge, again I'll object.[36]

THE COURT: Sustain the objection.

MR. ALLEN: Ask the jury be instructed to disregard it.

THE COURT: The jury will disregard the last question.

MR. ALLEN: Move for a mistrial.

THE COURT: That's denied.

(RR5: 78-80).

---

[36] Appellant anticipates that the State may argue that the second mistrial request is not preserved because defense counsel stated no grounds for his objection. However, this objection, the third during the same line of questioning, was made to the sole question asked *after* the trial court had already sustained two objections to almost identical questions. Under the facts of this case, the trial court clearly understood the basis of the objection. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (noting that issue preserved without having been explicitly stated if "there have been statements or actions on the record that clearly indicate what the judge and opposing counsel understood the argument to be") (*citing Resendez v. State*, 306 S.W.3d 308, 315-16 (Tex. Crim. App. 2009)). The trial court clearly recognized the error as it again sustained the objection and instructed the jury to disregard.

Defense counsel objected three times to the prosecutor's questions which were specifically designed to elicit evidence from Appellant of an extraneous offense of drug dealing. The trial court recognized the error and sustained all three objections. (RR5: 79-80). On the two occasions where the trial court was asked to instruct the jury to disregard, the trial court did so. (RR5: 79-80). Where the trial court erred, however, was in not granting one of the requested mistrials.

**Standard of Review**

A trial court's denial of a motion for mistrial is reviewed under an abuse of discretion standard. *Archie v. State*, 340 S.W.3d 734, 738-39 (Tex. Crim. App. 2011); *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). A mistrial is necessary in extreme circumstances when the prejudice caused by an improper question and answer is incurable. *Ladd*, 3 S.W.3d at 567; *see Whitney v. State*, 396 S.W.3d 696, 703-04 (Tex. App.—Fort Worth 2013, pet. ref'd) (stating that a mistrial is appropriate when an error is so prejudicial that expenditure of further time would be futile).

Appellant recognizes that asking an improper question will not always call for a mistrial if the harm can be cured by an instruction to disregard. *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000); *Ladd*, 3 S.W.3d at 567; *see also Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) (noting that a prompt instruction to disregard will often cure any prejudice associated with an improper

question and answer, even one regarding extraneous offenses). When a trial court instructs a jury to disregard an improper comment or question, the jury may be presumed to follow the court's instruction unless the remark or comment was so prejudicial or extreme that the instruction was incapable of removing the harm. *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987); *see also Wood*, 18 S.W.3d at 648. A mistrial is required, however, when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors. *Wood*, 18 S.W.3d at 648; *Ladd*, 3 S.W.3d at 567).

Whether a mistrial should have been granted involves similar considerations that attend a harm analysis. *Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007); *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Three factors are evaluated: (1) the severity of the misconduct, (2) curative measures employed by the trial court, and (3) certainty of the punishment assessed. *See Archie,* 221 S.W.3d at 700.

## Application of the Law to the Facts

In the case at bar, the curative instructions provided by the trial judge to the jury were insufficient to cure the error from the State's repeated and prejudicial questioning. The reference to Appellant as a "drug dealer" was clearly improper. TEX. R. EVID. 404(b); *Gardner v. State*, 730 S.W.2d 675, 697 (Tex. Crim. App.

1987) (finding that a witness's reference to defendant's prior incarceration was not proper). There had been no evidence introduced during the State's case in chief which implicated Appellant in any of the drug use going on in the Jones/Calhoun apartment that night. Nor was there any evidence to suggest that Appellant was at the apartment to sell and/or otherwise deliver drugs.[37] Certainly, there was no suggestion that the shooting was the result of a "drug deal gone bad." Indeed, the State's theory of the prosecution was that the shooting occurred over a dispute involving a prostitute, Catherine Deamon.

The defensive theory of the case was self-defense, *i.e*, that Charles drew a weapon, fired on Appellant first, and Appellant shot in Charles' direction only to defend himself. A secondary theory of defense was apparent danger, as Appellant knew Charles to carry a gun and thought Charles was reaching for a gun. The State's effort to portray Appellant as a drug dealer was not only irrelevant to the case, but was also designed specifically to undermine Appellant's credibility and his defensive theory before the jury. Interjecting an extraneous offense of drug dealing carried the very real probability of diverting the jury's attention from the facts surrounding the shooting.

---

[37] Indeed, the trial court excluded the only actual evidence of drug dealing, which was between Robert and Shepp. (RR3: 260-261).

Here, a mistrial was the only appropriate remedy. The curative measures taken by the trial court were obviously insufficient to correct the harm caused by the extraneous testimony. This is particularly true since, after the trial court's first instruction to disregard, the State simply continued to ask much the same question, thereby cementing the improper evidence in the minds of the jurors. As a result, the trial court abused its discretion by denying the requested mistrial. Appellant is entitled to a reversal and a remand for a new trial.

## Point of Error 6, Restated

### *The trial court erred by not holding a hearing on Appellant's motion for new trial.*

On September 17, 2014, the Court of Criminal Appeals granted Appellant the opportunity to file an out-of-time notice of appeal on grounds that trial counsel had failed to file a timely notice of appeal on Appellant's behalf. *Ex parte McMillan*, 2014 Tex. Crim. App. Unpub. LEXIS 961 at *1-2; (*see also* CR1: 120-121). In addition to filing a timely notice of appeal, Appellant filed a pro se motion for new trial containing allegations of ineffective assistance of trial counsel and newly discovered evidence. (CR1: 124-128,131-135). Attached to this motion was an affidavit that had been obtained on July 24, 2014, from Charles Alexander, who averred that he witnessed the shooting and saw Charles "jump" at Appellant after threatening to "get him." (CR1: 127-128,135).

The motion for new trial contained a sworn allegation of material evidence, favorable to Appellant, that had been discovered after the conclusion of his trial. TEX. CODE CRIM. PROC. art. 40.001 (providing that "a new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial"). A defendant is entitled to an evidentiary hearing if his motion for new trial and accompanying affidavits raise matters not determinable from the record upon which he could be entitled to relief. *Lucero v. State*, 246 S.W.3d 86, 94 (Tex. Crim. App. 2008).

Appellant anticipates that the State may argue that the motion for new trial was untimely. The Court of Criminal Appeals' opinion plainly ordered Appellant "returned to that time at which he may give written notice of appeal" and, further, that "*[a]ll time limits* shall be calculated as if the sentence had been imposed on the date which the mandate of this Court issues." (CR1: 121). The mandate issued on October 13, 2014.[38] The motion for new trial was file stamped on September 30, 2014. (CR1: 124). An identical motion for new trial was file stamped on October 24, 2014. (CR1: 131). Appellant submits that the Court of Criminal Appeals' order does not forbid the filing of a motion for new trial in addition to the filing of a notice of appeal. *Mestas v. State*, 214 S.W.3d 1, 4 (Tex. Crim. App. 2007) (finding

---

[38] *See* http://www.search.txcourts.gov/Case.aspx?cn=WR-80,864-02&coa=coscca.

that a defendant who was returned to a point at which he could give notice of appeal, was also returned to a point where he could file a motion for new trial). As a result, the motion for new trial was timely and the trial court had an obligation to hold a hearing on that motion. This Court should abate this appeal, direct the trial court to obtain Alexander's presence, and hold a hearing on the motion for new trial.

## Point of Error 7, Restated

***The trial court erred by overruling defense counsel's objection to improper jury argument at the punishment phase of the trial. (RR6: 56).***

## Point of Error 8, Restated

***The trial court erred by overruling defense counsel's motion for mistrial following improper jury argument at the punishment phase of the trial. (RR6: 56-57).***

## Point of Error 9, Restated

***The trial court erred by overruling defense counsel's objection to improper jury argument at the punishment phase of the trial. (RR6: 57-58).***

### *(Jointly Argued)*

During final jury argument at the punishment phase of the trial, the State argued as follows:

> (BY MS. DODDS) *He can't take the stand and talk about what a good father he is. He can't take the stand and talk about the effect that it will have on his family and his children from here on out*. He can't do it.

64

MR. ALLEN: Judge, that is improper argument.

THE COURT: Let me ask you to clarify which he you referred to.

MR. DODDS: Charles Calhoun.

THE COURT: All right. I'll overrule the objection.

(RR6: 56)(emphasis added).

Because the trial court overruled defense counsel's objection, the prosecutor continued to argue in the same vein:

> MS. DODDS: He can't speak for himself. You speak for him now. *You speak for this community now. You speak for that family now*.
>
> MR. ALLEN: I'll object. That is improper argument.
>
> THE COURT: I'll sustain that objection.
>
> MR. ALLEN: Ask the jury be instructed to disregard that.
>
> THE COURT: The jury will disregard the last part of the argument.
>
> MR. ALLEN: Move for a mistrial.
>
> THE COURT: That's denied.

(RR6: 56-57)(emphasis added).

Even after the defense's objection was sustained and the jury was instructed to disregard, the prosecutor continued this same argument:

> (BY MS. DODDS) Now I'm going to ask you to… find a fair number. You find a number that reflects not this guy, not this guy and his family. *You find a number that reflects Charles Calhoun and his family.*

65

MR. ALLEN: Objection, Judge. That's an improper plea.

THE COURT: I'll overrule that objection.

MS. DODDS: You find a number that you can make reflective of the fact that *this family doesn't have their family member*. They have lost what they have to lose now. That *this family can know it's fair*, knowing that they won't have their family member on Thanksgiving…on Christmas. They don't have that opportunity.

You come back with a number that's reflective of that. You come back with a number that's *reflective of our community*, of whether or not this man will be able to join us again.

(RR6: 57-58)(emphasis added).

## Jury Argument

Permissible jury argument generally falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of counsel; or (4) a plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2009).

## Expectations of the Victim/Victim's Family

It is improper to ask the jury to place themselves in the "shoes of the victim" to consider the punishment the victim would want imposed on the defendant. *See Torres v. State*, 92 S.W.3d 911, 922-23 (Tex. App. – Houston [14th Dist.] 2002, pet. ref'd). Courts have also held that references to the wishes of the family are

66

outside the record and should not be used in jury argument in an effort to increase punishment. *Culley v. State*, 505 S.W.2d 567, 569 (Tex. Crim. App. 1974).

Here, asking the jury to consider what Charles and his family might want in the way of punishment, and encouraging the jury to speak for Charles and his family, was improper argument. Indeed, these arguments were tantamount to asking the jury to place themselves in the "shoes of the victim" to consider what punishment the victim would want imposed upon Appellant. *See Torres*, 92 S.W.3d at 922-23. The trial court erred by overruling defense counsel's objections to those arguments and/or by denying defense counsel's requested mistrial.

## Expectations of the Community

While the State may request that the jury represent or be the voice of the community when reaching its verdict, *see Cortez v. State*, 683 S.W.2d 419, 421 (Tex. Crim. App. 1984), it is improper for the State to argue that the community expects a certain verdict or punishment. *See Borjan v. State*, 787 S.W.2d 53, 56 (Tex. Crim. App. 1990).

In arguing that the jury should "speak for this community now" and find "number that's reflective of our community," the prosecutor was asking the jury to assess punishment not on impartial objective notions of justice, but upon community expectations, *i.e.,* a high term of years in the penitentiary. *Cortez,* 683 S.W.2d at 420 (holding that argument that only life imprisonment "would be any

67

satisfaction at all to the people of this county" was an improper plea for jury to heed expectations of community); *Porter v. State*, 154 Tex. Crim. 252, 226 S.W.2d 435, 436 (1950) (holding that argument that the community expected jury to assess death penalty was improper). These arguments had the effect of asking the jury to punish Appellant upon the outside influence of public sentiment or demands, rather than upon the evidence that the jury had received. *Cortez,* 683 S.W.2d at 421. Moreover, the State's argument did not invoke the goal of deterrence. As such, the prosecutor's arguments went beyond mere pleas for law enforcement and were improper. The trial court erred by overruling defense counsel's objection to those arguments and/or by denying defense counsel's requested mistrial. Appellant is entitled to a reversal and to a new trial on punishment.

## Point of Error 10, Restated

***The judgment should be modified to reflect the correct names of the trial prosecutors. (CR1: 43).***

The judgment reflects that the prosecutor was "J Wilbanks." (CR1: 43). However, the record of the trial is clear that the prosecutors were Rebecca Dodds and Rick Jackson. (RR2-RR6: passim).

This Court has the authority to correct the judgment to make the record speak the truth when it has the necessary data and information to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993);

68

*Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Because the appellate record contains the necessary data and information to do so, Appellant prays that this Court will modify the judgment to reflect the correct names of the prosecutors.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Appellant prays that this Court will reverse Appellant's conviction and order an acquittal. In the alternative, Appellant prays that this Court will (1) reverse Appellant's conviction, reform the judgment to reflect a conviction for manslaughter and remand for a new punishment hearing; or, (2) will reverse Appellant's conviction for trial error and remand for a new trial on guilt/innocence; or, (3) will abate this appeal for a hearing on Appellant's motion for new trial; or, (4) will reverse Appellant's punishment and remand for a new trial on punishment. In the final alternative, Appellant prays that this Court will reform the judgment to correct the inaccuracies therein.

Respectfully submitted,

Lynn Richardson
Chief Public Defender
Dallas County, Texas

*/s/ Katherine A. Drew*
Katherine A. Drew
Assistant Public Defender
State Bar No. 06117800
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-2
Dallas, Texas 75207-4399
(214) 875-2360 *(phone)*
(214) 875-2363 *(fax)*
Kathi.Drew@dallascounty.org

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing brief was served on the Dallas County Criminal District Attorney's Office (Appellate Section), 133 N. Riverfront Blvd., LB-19, 10th Floor, Dallas, Texas, 75207, by electronic transmission and by hand delivery on May 13, 2015.

*/s/ Katherine A. Drew*
Katherine A. Drew

## CERTIFICATE OF COMPLIANCE

I hereby certify that in accordance with the terms of TEX. R. APP. P. 9.4(i)(1) the word count in this document, which is based on the word count function of Microsoft Word 2010, the software in which this document was prepared, is 14,733 inclusive of all contents except for the cover page, table of contents, index of authorities, identity of parties, caption, statement of the case, list of the issues presented, signature, certificate of service, and certificate of compliance.

*/s/ Katherine A. Drew*
Katherine A. Drew

70